UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ROCHELL JAMISON,

                      Petitioner,           03 Civ. 4826 (HB)

         - against-                 **OPINION & ORDER**

R.A. GIRDICH,

                      Respondent.
------------------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

      Rochell Jamison petitions[1] this court for a writ of habeas corpus pursuant to 28 U.S.C. Section 2254 (1994 & Supp. 2003). Jamison was convicted on July 21, 1998, in New York State Supreme Court, New York County, of one count of first-degree assault, one count of first-degree criminal use of a firearm, and one count each of second and third-degree criminal possession of a weapon. Jamison now challenges his conviction on the grounds that he was denied (1) his right to counsel owing to a more than 24 hour delay in his arraignment during which he provided a videotaped confession; (2) his due process rights because the photo array and lineup which resulted in his out of court identification were unduly suggestive; and (3) his right to a fair trial as a result of jurors prematurely discussing his case. For the reasons set forth below, Jamison's petition is denied.

## I. FACTUAL BACKGROUND

**A.    Events at the 360 Club**

      On the evening and early morning of December 6-7, 1997, James Daniels celebrated his bachelor party with a group of friends at several bars and gentlemen's clubs in New Jersey and New York. See, e.g., 06/10/1998 trial transcript ("Tr.") at 110-18, 318-23, 424-30, 453-56. This group included Rodrick Stevens, Wayne Fisher, and Darris Edwards. Tr. at 110-11, 318, 454-55. Between 4.30 a.m. and 5.00 a.m. on December 7, Daniels and his friends proceeded to an after-hours club called 360, at 360 Convent Avenue, at the corner of 145th Street in Manhattan. Tr. at 118-19, 124, 323-35, 426.

---

[1] Jamison filed his petition pro se, but was aided by counsel in the preparation and submission of his supporting brief.

1

Jamison and his friend, Tony, were also at 360 that morning.  Tr. at 759-60.  Tony overheard Daniels make a comment about "knocking [someone] out," assumed that the comment was addressed at himself and Jamison, and told Jamison that Daniels had threatened to knock them out.  Tr. at 337-38, 763.  Just before 6 a.m., Jamison and Tony left the club.  Tr. at 764, 766.  About three to five minutes later, the Daniels group also left.  Tr. at 341, 475.

The trial record presents contradictory versions of what happened next.  Daniels, Stevens, Fisher, and Edwards testified that as they headed towards their car, Jamison approached Daniels and asked him why he had said he was going to knock someone out.  Tr. at 130-31, 351, 466, 609-10.  Daniels explained that he meant he was going to knock out his friends for getting him drunk.  Tr. at 466-67.  Nonetheless, Jamison became irate, reached into Tony's waistband, took out a gun, pointed it at Daniels, and shot him in the face.  Tr. at 138, 140, 234-36, 470, 617-18.  Jamison and Tony then got into their car and drove off.  Tr. at 141, 357, 471.

Jamison testified that as he and Tony were getting into their car, Daniels and his friends emerged from the club and started to talk to them.  Tr. at 773-74.  Then, one of the Daniels group said "[a]nything can happen" and reached up under his shirt as if he had a gun.  Tr. at 774-75.  That person took his hand out without a gun, however, and Jamison seized the chance to "get away."  Tr. at 775-76.  He grabbed the gun from Tony's waistband and randomly fired a shot to buy time.  Tr. at 776.  Jamison and Tony then ran to their car and drove off.  Id.

The gunshot left Daniels with an open wound on the left side of his face.  Tr. at 261-62.  The doctor who treated Daniels described the wound as "a trough between the nose and the ear" that was eleven centimeters long and about three or four centimeters wide.  Tr. at 268.  In the doctor's opinion, if the path of the bullet had been off by even a fraction of a degree, the bullet could have entered Daniels' skull through his eye and killed him immediately.  Tr. at 289.

**B.** **Police Investigation and Arrest**

At about 10 a.m. on December 7, 1997, Detective Warren McKinzie interviewed Daniels' friends at the hospital in Teaneck, New Jersey, where Daniels had been rushed for treatment.  Tr. at 361, 658-60.  Fisher gave Detective McKinzie Jamison's name, which he had obtained from a woman with whom Jamison had flirted at 360.  Tr. at 401-03.  Detective

2

McKinzie then compiled a photo array with the aid of a computer imaging system. 06/01/1998 Suppression Hearing Transcript ("Hr'g Tr.") at 19-20. The array consisted of Jamison's photograph and photographs of six individuals who had the same basic facial characteristics as Jamison. Hr'g Tr. at 20. After viewing the array, Fisher and Edwards identified Jamison as the person who shot Daniels. Hr'g Tr. at 24, 27.

Detective McKinzie arrested Jamison at about 2.25 p.m. on December 14, 1997 and took him to the 30th Precinct. Tr. at 724; Hr'g Tr. at 31. At approximately 3.40 p.m. that day, Detective McKinzie read Jamison his Miranda rights and obtained a written statement in which Jamison denied any involvement in the shooting. Hr'g Tr. at 57-58, 65-66. Detective McKinzie then assembled a lineup that Fisher and Edwards viewed at about 11.10 p.m. the night of December 14, 1997. Hr'g Tr. at 69-71. Both identified Jamison as Daniels' attacker. Hr'g Tr. at 69, 71. Between 12.00 a.m. and 1.00 a.m. on the morning of December 15th, Jamison was fingerprinted, taken to central booking, and lodged in a holding cell. Hr'g Tr. at 78-79. At approximately 4.25 p.m. on December 15th, Jamison made a videotaped confession. Hr'g Tr. at 81. Jamison was arraigned after he had made the videotaped statement. See Pet'r Appellate Div. Br., Ex. A to Resp't Opp'n at 6.

**C.    Jury Verdict and Appeal**

On June 19, 1998, the jury acquitted Jamison of a charge of second-degree attempted murder but found him guilty of first-degree assault, first-degree criminal use of a firearm, and second and third-degree criminal possession of a weapon. Tr. at 1260-61. On July 21, 1998, the court sentenced Jamison, as a persistent violent felony offender, to indeterminate prison terms of thirty years to life on the assault count and twenty-five years to life on the criminal use of a firearm count, to run consecutive to concurrent indeterminate prison terms of twenty-five years to life on each of the weapons possession counts. 07/21/1998 Sentencing Hearing Transcript at 79, 82-84.

On direct appeal, Jamison challenged his conviction on three grounds: (1) deprivation of his right to counsel because of a more than twenty-four hour delay in his arraignment; (2) unduly suggestive photo array and lineup; and (3) premature jury deliberation. See Pet'r Appellate Div. Br., Ex. A to Resp't Opp'n at 2. The Appellate Division unanimously affirmed Jamison's conviction on February 19, 2002. See People v. Jamison, 737 N.Y.S.2d 614 (N.Y. App. Div. 2002). Specifically, the court ruled that Jamison's motion to suppress

identification testimony was properly denied because the photo array and lineup were not unduly suggestive; that Jamison's deprivation of counsel argument was moot because his videotaped confession had never been introduced into evidence; and that there was no basis to disturb the trial court's determination that the jurors had credibly stated that they were capable of rendering an impartial verdict.  See id.

On March 4, 2002, Jamison's counsel moved the New York Court of Appeals for leave to appeal, specifically requesting review of two of his appellate points:  (1) unduly suggestive pre-trial identification; and (2) juror misconduct.  See Pet'r Letter to New York Court of Appeals, Ex. D to Resp't Opp'n at 4.  The Court of Appeals summarily denied the motion on May 10, 2002.  See People v. Jamison, 772 N.E.2d 613 (N.Y. 2002).

## II. DISCUSSION

### A. Standard of Review

Federal courts have limited power to review criminal convictions from state courts. A federal court may grant habeas corpus relief to petitioners convicted in state court proceedings only if the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (Supp. 2003). A state court's determination will be deemed "contrary to" established federal law only if the state court (1) applied a rule different from the governing law set forth by the Supreme Court, or (2) decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  See William v. Taylor, 529 U.S. 362, 404-05 (2000).  The state court determination is an "unreasonable application" of federal law if the state court correctly identified the governing principle from Supreme Court decisions but unreasonably applied that principle to the facts of the case. Id. at 407-08. The focus of the "unreasonable" clause is not whether the state court incorrectly applied the law, but whether the court's application of clearly established federal law is objectively unreasonable. Id. at 409. Further, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting a habeas review, federal courts are limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Additionally, in a habeas corpus proceeding, "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1) (Supp. 2003). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Id. Therefore, this Court "presumes that the factual findings of the New York courts are correct and will not set aside those findings unless 'the material facts were not adequately developed at the State court hearing' or the court's factual determinations are not fairly supported by the record." Bohan v. Kuhlmann, 234 F. Supp. 2d 231, 243 (S.D.N.Y. 2002) (citing Smith v. Mann, 173 F.3d 73, 76 (2d Cir. 1999)).

A petitioner who challenges his custody pursuant to a state court conviction must first exhaust all state remedies unless "it appears that . . . circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1) (Supp. 2003). Here, Respondent argues that Jamison's arraignment delay and juror misconduct claims are procedurally barred from federal review. Because the grounds for Respondent's arguments differ in each instance, I will address the procedural challenges below in relation to the individual claims.

**B.     Arraignment Delay**

In his application for a writ of habeas corpus, Jamison alleges that he was deprived of his right to counsel because the more than twenty-four hour delay between his arrest and his arraignment resulted in his making an uncounseled videotaped confession. See 05/30/2003 Pet'r Application for Writ of Habeas Corpus, Ex. K to Resp't Opp'n. In his brief in support of his petition, however, Jamison concedes that he is not entitled to habeas review of this claim because he had "failed to fully exhaust" it by omitting to raise it in his request to the New York Court of Appeals for leave to appeal. See Pet'r Br. at 3-4.

Jamison is correct that this claim is procedurally barred from habeas review, but incorrect that the claim is not exhausted. When a habeas petitioner fails to raise a claim in his appeal request to the New York Court of Appeals, and the Appellate Division has previously determined the issue on an adequate and independent state ground on direct appeal, as is the case here, the claim is deemed exhausted and procedurally forfeited. See Harris v. Reed, 489 U.S. 255, 262 (1989); Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991); see also People v. Jamison, 737 N.Y.S.2d 614 (N.Y. App. Div. 2002) (ruling Jamison's arraignment delay claim to be moot because his videotaped confession was never introduced into evidence at trial). In

5

such circumstances, the claim is deemed exhausted because the petitioner no longer has "remedies available in the courts of the State." See Grey, 933 F.2d at 120 (citing 28 U.S.C. § 2254(b) & (c)). Consequently, Jamison may only litigate his deprivation of counsel claim on the merits in this habeas proceeding if he can demonstrate cause for the procedural default and prejudice resulting therefrom, or that failure to consider the claim will result in a "fundamental miscarriage of justice." Harris, 489 U.S. at 262. Jamison admits that he is unable to make a showing under either standard because the uncounseled confession was neither introduced into evidence nor utilized for his cross-examination at trial. See Pet'r Br. at 3. Therefore, Jamison's claim that he was denied his right to counsel because of an undue delay in his arraignment is barred from habeas review.

**C.    Pre-Trial Identification Procedures**

Jamison next contends that his pre-trial identification procedure was unduly suggestive, and that therefore admission of the identification evidence at trial violated his due process rights. Specifically, Jamison asserts that eyewitnesses described Daniels' attacker as having a facial scar, and he was the only individual in the photo array and lineup that had a facial scar. See Pet'r Br. at 6-7. Jamison exhausted this claim by presenting it to the Appellate Division in federal constitutional terms, and by explicitly asking the Court of Appeals to grant leave based on this same issue. See Pet'r Appellate Div. Br., Ex. A to Resp't Opp'n at 35-36; Pet'r Letter to New York Court of Appeals, Ex. D to Resp't Opp'n at 2-4. Accordingly, this claim is properly before this Court and I proceed to review the merits.

In deciding whether to admit testimony based on pre-trial identification, a court must first determine whether the pre-trial identification was obtained through unnecessarily suggestive procedures. See Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). If the procedures were not suggestive, there is no due process obstacle to the admissibility of the identification evidence. See id. (citing Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986)). The court need conduct no further inquiry, and the reliability of the properly admitted eyewitness identification becomes a matter for the jury. See id. (citing Foster v. California, 394 U.S. 440, 442 n.2 (1969)). An identification procedure is unduly suggestive if the defendant "meets the description of the perpetrator given by the witness and the other [individuals] obviously do not." Id. at 134. Courts have found lineups to be unduly suggestive where the suspects were the only participants that wore distinctive clothing or

otherwise matched important elements of the description of the perpetrator. See id. (citing
Israel v. Odom, 521 F.2d 1370, 1374 (7th Cir. 1975)).

Here, Fisher and Edwards identified Jamison from a photo array and a lineup[2] in
which, Jamison maintains, he was the only featured individual with a facial scar. The trial
court found from the suppression hearing testimony and photographic evidence, however, that
Jamison's facial scar played no part in the identifications from the lineup because Jamison
was positioned so that his scar was not obvious. See Trial Ct. Suppression Decision, Ex. J to
Resp't Opp'n at 12. The Appellate Division affirmed after independent review of the lineup
photograph. See People v. Jamison, 737 N.Y.S.2d 614 (N.Y. App. Div. 2002). The Appellate
Division also found, after independent review of the photo array, that Jamison's scar was
"barely visible." Id. Further, the state courts found that the fillers in the lineup and photo
array were sufficiently similar in appearance to Jamison. See id.; Trial Ct. Suppression
Decision, Ex. J to Resp't Opp'n at 8. In a habeas proceeding, these factual determinations by
the state courts are presumed to be correct, and Jamison has failed to rebut this presumption of
correctness with any evidence, much less the "clear and convincing" evidence required by 28
U.S.C. Section 2254(e)(1). See id. (Supp. 2003).

In Blas v. Herbert, I concluded that a pre-trial lineup was not unduly suggestive. Id.,
No. 02 Civ. 6257, 2003 WL 22480093, at **4-5 (S.D.N.Y. Oct. 31, 2003) (Baer, J.). There,
an eyewitness had described the perpetrator as having a facial scar, and Blas was the only
participant in the lineup with a facial scar. See id. at *1, *4. Blas' position in the lineup,
however, hid his scar from viewers. See id. at *4. Moreover, even if a viewer had looked at
Blas head-on, it was still unlikely that the viewer would have noticed the scar, as it was
"wholly imperceptible" in the photographs of the lineup. Id. Further, the other lineup
participants were similar to Blas in height, build, and skin tone. See id. Finally, courts had
ruled that pre-trial procedures were suggestive only in cases where the defendant's
distinguishing features were strikingly more apparent than Blas' scar, such as when the
defendant was the only participant that wore a black leather coat or a pair of eyeglasses. See
id. (citing Raheem, 257 F.3d at 122; Israel, 521 F.2d at 1374). Because the defendant did not
appear obviously different from the fillers in the lineup, I held that the pre-trial identification

---

[2] Neither the photo array nor photographs of the lineup have been provided to this Court as part of the record.

7

procedure in Blas was not unduly suggestive, and the facts here support the same conclusion.

Even if the pre-trial procedures had been unduly suggestive, admission of the pre-trial identifications would nevertheless constitute harmless error. An error is harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). One of the principal factors as to whether the erroneous admission of evidence is harmless is "the importance of the witness's wrongly admitted testimony." Raheem, 257 F.3d at 142 (citing Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000)). In assessing importance, the court considers "whether the testimony bore on an issue that is plainly critical to the jury's decision, [and] whether that testimony was material to the establishment of the critical factor or whether it was instead corroborated and cumulative." Id.

Here, Jamison himself admitted under oath at trial that he had fired the shot that hit Daniels in order to buy time to escape. In other words, Jamison's defense was not that he did not shoot Daniels, but rather that he had acted in self-defense. Consequently, witness identifications of Jamison as Daniels' assailant would have been immaterial, if not wholly irrelevant, to the jury's determination of whether Jamison was justified in shooting Daniels.

### D.     Juror Misconduct

Finally, Jamison argues that he was denied his Sixth Amendment right to a fair trial as a result of the jurors' premature deliberation. Towards the close of trial, after both sides had rested, defense counsel moved for a mistrial. Tr. at 903. She alleged that her paralegal, Alberto Retamar, and a defense witness, Serena Abbitt, had each independently reported to her that during a break in the testimony the previous day, they had observed many jurors in the hallway "laughing and joking about the defense, saying words to the effect that they could not wait to . . . convict the defendant." Tr. at 902-03. In response to this information, the court interviewed Abbitt, Retamar, and each of the jurors separately, and gave defense counsel and the prosecutor the opportunity to question them. Tr. at 909-1032.

Abbitt told the court that she had witnessed five or six jurors discuss Jamison's testimony about how he had reached for the gun. Tr. at 911. She had heard them repeat a comment they had heard another juror make about "what more evidence do they need." Tr. at 914. Retamar testified that he had observed eleven jurors laughing and heard two of them

8

remark how stupid the defendant looked and that "someone must have been crazy . . . to think he may be acquitted from the case." Tr. at 928.

Two jurors admitted that they had discussed the case. Juror number 9 said she had talked about the case "in generalities" with two of the alternates but that they had not discussed any of the previous day's testimony. Tr. at 1006-09. She also told the court that she had not formed an opinion about the case and could be fair and impartial to both sides. Tr. at 1006-07. Alternate Juror number 4 admitted that jurors had discussed the case in a "very general sense" but that neither he nor anyone in his presence had commented on Jamison's testimony. Tr. at 951, 964. He also assured the court that he would be able to render an impartial verdict. Tr. at 950.

After the defense witnesses and all sixteen jurors had been questioned, the court denied the defense motion for a mistrial. Tr. at 1035. The court explained that nothing it had heard indicated that the jurors had abandoned the oath they had taken to obey the court's legal instructions and to render a verdict based on the evidence. Tr. at 1035-36.

Respondent contends that Jamison's claim that he was denied a fair trial is not exhausted because Jamison had failed to raise this claim in constitutional terms in state court. See Resp't Br. at 27-28. This procedural challenge warrants little discussion because I find that Jamison's claim is meritless. Because 28 U.S.C. § 2254(b)(2) permits a reviewing court to deny non-meritorious habeas petitions "notwithstanding the failure of the applicant to exhaust" state remedies, I will proceed to discuss the merits of Jamison's claim. Id. (Supp. 2003).

Where the trial court "instructs a jury to refrain from premature deliberation . . . and the jury nonetheless discusses the case before the close of trial, that premature jury deliberation may constitute juror misconduct" that encroaches on the criminal defendant's right to a fair trial. United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003) (emphasis added). The key inquiry is not whether the jurors kept silent with each other about the case, but whether "each juror [kept] an open mind" until the case was submitted to the jury. See Brown v. Greiner, No. 02-CV-2043, 2003 WL 22964395, at *13 (E.D.N.Y. Oct. 2, 2003) (Weinstein, J.) (quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)). The court's "investigation of juror misconduct or bias is a 'delicate and complex task.'" Cox, 324 F.3d at 86 (quoting United States v. Abrams, 137 F.3d 704, 708 (2d Cir. 1998)). The trial court is

afforded broad flexibility in such matters, "especially when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences." Id. (quoting United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994)). The court's treatment of juror misconduct and its decision on a jury's impartiality are reviewed for abuse of discretion. See id. at 86-87.

Jamison contends that the trial court ignored the evidence that defense counsel presented of premature deliberation by the jurors, and hence made no determination as to whether it in fact occurred, nor explored the prejudicial effect of the misconduct. See Pet'r Br. at 22. To support his argument, Jamison cites to United States v. Resko, 3 F.3d 684 (3d Cir. 1993). See Pet'r Br. at 21-23. In Resko, the court was informed that jurors had discussed the case while the trial was still ongoing. See id. at 687. The court administered a written questionnaire to the jurors to ascertain whether they had indeed engaged in premature deliberations. See id. at 688. All twelve jurors responded that they had discussed the facts of the case with other jurors, but that they had not formed an opinion about the defendants' guilt. See id. The trial court then denied the defendants' motion for further inquiry and proceeded with the trial. See id. The Third Circuit held that the trial court had abused its discretion by declining to engage in further inquiry, such as individualized voir dire, so as to determine whether the jurors had maintained open minds. See id. at 691. By failing to do so, the district court had "allowed the jurors . . . to be the judge of whether or not they had been influenced by their premature discussions." Id.

That is not this case. Here, the trial court did conduct an individualized voir dire after defense counsel brought forth evidence of premature juror discussion. Only after the voir dire did the court hold that it was persuaded that the jurors would render an impartial verdict. Therefore, unlike in Resko, the trial court here reached its own informed opinion as to whether the jurors had been influenced by their premature discussions. Notably, the Third Circuit in Resko explained that had the trial court conducted "some additional inquiry" to ascertain whether the jurors had been influenced by their premature deliberations, that would have "sufficed to support any determination it made about the absence of prejudice against the defendants." Id. at 692.

This case is more analogous to United States v. Cox, 324 F.3d 77 (2d Cir. 2003). In that case, a legal secretary employed by the United States Attorneys' office told the trial court

that during a break in the trial proceedings, one of the jurors told her that another juror had poked her to keep her awake "because the jurors wanted a conviction." Id. at 85. At a hearing that the court scheduled to determine whether there had been any juror misconduct, both of the jurors involved denied that there had been any discussion about the merits of the case. See id. The trial court also briefly questioned the jury as a group. See id. Based on these inquiries, the court concluded that there was no prejudice to the defendants from juror misconduct and allowed the trial to resume. See id. at 86. The Second Circuit held that the trial court had not abused its discretion in its treatment of the matter because the jurors' responses supported the court's findings that the jury had not discussed substantive issues and that the defendants were not prejudiced. See id. at 87. The Second Circuit elaborated that the trial court properly accepted the jurors' account as, absent evidence to the contrary, "a court should generally presume that jurors are being honest." Id.

Here, the trial court's determination that the jury would keep an open mind was based on a more extensive inquiry than in Cox, and while I am somewhat troubled by some of the testimony, I find that the trial court did not abuse its discretion when it presumed that the jurors had responded honestly to its questions because there was no evidence to the contrary. Indeed, that the jury acquitted Jamison of the second-degree attempted murder charge lends further support to my conclusion that the trial court properly determined that the jurors would obey the court's instructions and render a verdict on the evidence. Accordingly, Jamison's claim that he was denied a fair trial has no merit.

### III. CONCLUSION

For the foregoing reasons, Jamison's petition for a writ of habeas corpus is denied. The Clerk of the Court is directed to close this petition and remove this case from my docket. Because Jamison has not "made a substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. See 28 U.S.C. § 2253(c)(2) (Supp. 2003).

**IT IS SO ORDERED.**
**New York, New York**
**September 26, 2005**

U.S.D.J.